**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

JAMES TONEY,                              )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        No. 4:10-CV-2056-JAR
                                          )
MICHAEL HAKALA, et al.,                   )
                                          )
                    Defendants.           )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment. [Doc.

No. 173] On January 16, 2013, Plaintiff submitted a Memorandum in Opposition to Defendants'

Motion for Summary Judgment ("Response," Doc. Nos. 201, 203) On January 23, 2013, Plaintiff

filed a 148-page Statement of Uncontroverted Facts in Support of his Opposition to Defendants'

Summary Judgment ("PSOF," Doc. No. 205), a 185-page Affidavit in Support of his Opposition

to Defendants' Motion for Summary Judgment ("Aff.," Doc. No. 206), a Statement of Facts In

Controversy (Doc. No. 207), and more than 800 pages of supporting exhibits. Defendants filed

their reply on April 26, 2013. (Doc. No. 241) Plaintiff filed a surreply on June 14, 2013. (Doc.

No. 250) The motion is therefore fully briefed and ready for disposition. For the following

reasons the motion will be granted.

### I. **Background**

Plaintiff James Toney, a Missouri inmate, is presently confined at the Eastern Reception,

Diagnostic and Correctional Center ("ERDCC"). Plaintiff has been confined in the Missouri

prison system since 2000, and transferred to various facilities, including Southeast Correctional

Center ("SECC") in 2009, and Potosi Correctional Center ("PCC") from October 13, 2009 to

July 11, 2011. On October 27, 2010, Plaintiff filed this action under 42 U.S.C. § 1983, seeking damages against Defendant doctors Hakala and McKinney, and nurses Vinson, Spain, Randolph and Klein, for deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution. (First Amended Complaint ("FAC"), Doc. No. 55)

Defendants contend they are entitled to summary judgment because Plaintiff is unable to present sufficient facts or evidence to establish that they acted with deliberate indifference towards his serious medical needs in violation of his constitutional rights or that any alleged delay in his medical treatment had a detrimental effect or constituted a constitutional deprivation. Plaintiff vigorously opposes the motion.

## II.  Legal Standard

Summary judgment is appropriate when no genuine issue of material fact exists in the case and the movant is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The initial burden is placed on the moving party.  City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988).  If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether summary judgment is appropriate in a particular case, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Benford v. Correctional Medical Services, 2012 WL 3871948, at *4 (E.D.Mo. Sept. 6, 2012) (citing Celotex Corp., 477 U.S. at 331). The Court's function is not to weigh the evidence but to

determine whether there is a genuine issue for trial. Id.(citing Anderson, 477 U.S. at 249).

"'Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge.'" Id. (quoting Torgerson v.

City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011)).

As a threshold matter, Defendants contend Plaintiff's submissions fail to comply with the

requirements of Fed.R.Civ.P. 56 and Local Rule 7-4.01(E). (Reply, Doc. No. 241, pp. 3-8)[1]

Defendants argue that Plaintiff's attempts to challenge their statements of uncontroverted

material fact by mischaracterizing his medical records and asserting his own personal opinions

as to the nature and extent of his medical conditions and desired course of treatment, are not

proper and should not be considered for summary judgment purposes. See Lujan v. Defenders of

Wildlife, 504 U.S. 555, 561 (1992) (Plaintiff "may not rely on mere denials or allegations," but

must designate specific facts showing that there is a genuine issue of fact for trial.); Hernandez v.

Jarman, 340 F.3d 617, 622 (8th Cir. 2003) (non-moving party must state the facts that contradict

those facts of the moving party, and then provide citations relating only to the specific fact

presented). In addition, Plaintiff attaches over 800 pages of documentary evidence, including

what appears to be chapters from medical textbooks and portions of medical treatises, without

laying a proper foundation for use of these materials. (See Doc. No. 205, Ex. A, pp. 18-72; 96;

Ex. B, pp. 110-131-2; Ex. D, pp. 412-467; Ex. G, pp. 770-818) Defendants also point to a

number of diagrams in Plaintiff's Statement of Uncontroverted Facts which they assert are

inadmissible and not properly before this Court. (See Doc. No. 205, pp. 2-4, 16, 18-19, 25, 38,

---

[1] Defendants have summarized Plaintiff's unsupported factual assertions in an Appendix
submitted with their Reply to Plaintiff's Response. (Doc. No. 242)

45, 73-74, 77, 79) Defendants maintain that Plaintiff's "factual assertions" are arguments, conjecture, speculation, and/or conclusions, the majority of which are unsupported by any evidence. (Reply, p. 6) Moreover, where Plaintiff does attempt to support his assertions with documentary evidence, the cited material either does not support the assertion or lacks foundation. (Id.)

Plaintiff has also submitted declarations from several fellow inmates in an attempt to establish that he suffered injuries and had several medical conditions while confined in various MDOC facilities, and that the medical staff at these facilities failed to provide him with adequate medical care. (See Joseph Becker (Doc. No. 205, Exs. 73-78); Scott McLaughlin (Doc. No. 56, Exs. 75-78); Delarcie Davis (See id.); Ron Shelton (See id.); Mark Christeson (Doc. No. 56-1, Ex. 144); David Combrevis (See id., Ex. 150); Damon Johnson (Doc. No. 205, Exs. 166-167)[2]; Lonnie Bourisaw (See id., Exs. 606-608); Donnie Connors (See id., Exs. 578-582); and Ronald Keller (See id., Ex. 611 A-D).[3] To the extent these declarations contain medical opinions regarding Plaintiff's medical condition and the care and treatment he received, Defendants argue these declarations contain inadmissible evidence and should be stricken because there is no indication these inmates are qualified to give such opinions. See Luepker v. Taylor, 2010 WL 2696701, at *1 (E.D.Mo. July 6, 2010) ("Rule 56(e) requires affidavits submitted upon a motion for summary judgment to be made on personal knowledge and to show that the affiant is

---

[2]On September 3, 2013, Plaintiff, with leave of Court, substituted a corrected affidavit of Damon Johnson (Doc. No. 252-1) for his original affidavit (Doc. No. 52-3, pp. 81-82).

[3]Defendants also reference declarations of Jeff Bruenger and Terry Bollinger; however, the Court carefully reviewed Plaintiff's exhibits and found no declarations from these inmates in the record.

4

competent to testify on the matters stated . . . Where an affidavit does not meet this standard, it is subject to a motion to strike.") (citing El Deeb v. Univ. of Minn., 60 F.3d 423, 428-29 (8th Cir. 1995)). (Reply, p. 8) Defendants further argue that the declarations of Mr. Bruenger, Mr. Bollinger, Mr. Bourisaw and Mr. Keller should be stricken from the record because Plaintiff failed to disclose them prior to filing his response as required under Rules 26(a)(1)(A)(i)-(ii) and 26(e)(1)(A). (Id.)

Plaintiff's pro se status does not excuse him from responding to Defendants' motion "with specific factual support for his claims to avoid summary judgment," Beck v. Skon, 253 F.3d 330, 333 (8th Cir. 2001), or from complying with local rules, see Schooley v. Kennedy, 712 F.2d 372, 373 (8th Cir. 1983). See also Carman v. Treat, 7 F.3d 1379, 1381 (8th Cir.1993) (failing to allow pro se prisoner to disregard Federal Rules of Civil Procedure). Like any other civil litigant, Plaintiff is required to respond to Defendants' motion with specific factual support for his claims to avoid summary judgment. Nevertheless, to the extent that Plaintiff's submissions can be considered to controvert facts asserted by Defendants in their statement of uncontroverted facts, the facts are not material to the determination of Defendants' motion because, as further discussed herein, it is undisputed that Plaintiff received medical care and treatment. As such, the Court will deny Defendants' motions to strike and consider Plaintiff's submissions.

Finally, Defendants argue that in his Statement of Uncontroverted Facts and Affidavit, Plaintiff asserts new claims that were not raised in his amended complaint[4], specifically claims of deliberate indifference to his medical needs that occurred *after* his amended complaint was

_____

[4]In his First Amended Complaint, Plaintiff focuses on the care and treatment he received while confined at SECC and PCC.

filed on May 9, 2011. (Reply, p. 6) However, Defendants have responded to these new claims, asserting that Plaintiff continued to receive care and treatment for his chronic pain after he was transferred from PCC in July 2011. (See Mem. in Supp., Doc. No. 174, p. 15; SOF ¶¶ 104-135) Thus, the Court will address Plaintiff's additional claims after careful consideration of the record.

### III.  Facts[5]

### A. Treatment received at SECC

The medical history and records in this case are extensive. On April 9, 2009, Plaintiff underwent a physical examination while confined at SECC. (SOF, ¶ 10) During his exam, he advised of occasional pain from his left leg to his foot. (Id.)

On June 22, 2009, Plaintiff was seen by a nurse regarding his complaints of left leg and hip pain. (SOF, ¶ 11) Plaintiff complained that his pain was chronic and that he experienced numbness. (Id.) Upon examination, Plaintiff's hip and leg were tender to the touch and he was observed walking with a limp. (Id.) On June 30, 2009, Plaintiff was referred to a physician. (SOF, ¶ 12) He was scheduled to see Dr. Hakala on July 8, 2009, but the appointment was canceled because his movement was restricted. (Id.)

On July 16, 2009, Dr. Hakala examined Plaintiff. (SOF, ¶ 13) During his exam, Plaintiff

_____

[5] Defendants' forty-page Statement of Uncontroverted Material Facts (Doc. No. 175) includes 141 alleged facts, each supported by reference to specific portions of the record. The Court will cite those statements as "SOF" where they are properly supported. Plaintiff's 148-page Statement of Uncontroverted Facts in Support of his Opposition to Defendants' Summary Judgment (Doc. No. 205) includes 790 alleged facts. The Court will cite those statements as "PSOF," where those statements are properly supported. Again, mere arguments, speculation and/or conclusions fail to create a genuine issue of material fact sufficient to defeat summary judgment.

explained that he had been a carpenter and had fallen once on his mid-back. (Id.) Plaintiff also

complained of pain in his neck, back, hip, legs and left foot. (Id.) He informed Dr. Hakala that at

times his thumb becomes numb, and that when stretching to the side, he feels a "pop" in his mid-

back, which eventually improves. (Id.) Dr. Hakala's assessment was that Plaintiff had an old

mid-back injury. He suspected mild left side sciatica. (Id.) Dr. Hakala's treatment plan was pain

medication and x-rays of the cervical spine with obliques, thoracic spine and lumbar spine. (Id.)

He further advised Plaintiff to stay active, but not to lift too much. (Id.)

On July 21, 2009, Plaintiff underwent the following x-rays at Mid-Missouri Medical:

frontal, lateral and oblique views of the cervical spine; frontal and lateral views of the thoracic

spine; and frontal, lateral and oblique views of the lumbar spine. (SOF, ¶ 14) The x-ray of the

cervical spine revealed mild disc space narrowing at C5-6 and C6-7, without evidence of

significant boney neural foraminal stenosis, fracture or subluxation. (Id.) The impressions from

the thoracic spine x-ray were mild scoliotic deformity but no acute bony injury visible. (Id.) The

lumbar spine x-ray was negative for boney abnormality. (Id.)

On August 13, 2009, Plaintiff complained of neck and back pain and asked to see the

doctor to review his x-ray results. (SOF, ¶ 15) Plaintiff was seen by a nurse on August 28, 2009,

for his complaints of chronic back pain. (SOF, ¶ 16)  He reported his pain level at rest to be a 5,

increasing to 8 with activity. (Id.) Plaintiff stated he has had back pain for months and that four

months prior he had been injured playing basketball. (Id.) The nurse referred Plaintiff to a doctor

to review his condition and discuss the results of his last x-rays. (Id.)

Plaintiff was seen by nursing staff for his complaints of neck pain and left arm numbness

on September 1, 2009. (SOF, ¶ 17) Because Plaintiff already had an upcoming scheduled

appointment with the doctor, the plan was to keep his appointment with the doctor. (Id.)

On September 15, 2009, Dr. Hakala met with Plaintiff to evaluate his lab and x-ray results. (SOF, ¶18) Plaintiff explained to Dr. Hakala that he had been hit on the left side of his head with a ball in April, at which time he heard a pop and began to experience numbness in the fifth finger side of his right hand as well as pain on the inside of his right scapula. (Id.) Dr. Hakala found that Plaintiff's right scapula was weak, he had a "slight decrease" in range of motion in his right arm in abduction and flexion, his right grip was weak, and his right bicep strength was weak compared to his left bicep. (Id.) Based on the x-rays and his examination, Dr. Hakala suspected a right side C6-7 disc bulge. (Id.) Dr. Hakala's treatment plan was to prescribe pain medication, enroll Plaintiff in the chronic pain clinic, and order an MRI. (SOF, ¶¶ 18, 19) Dr. Hakala requested a referral for an MRI of cervical spine to T-1 on September 15, 2009, which request was approved the following day. (SOF, ¶ 19)

On October 2, 2009, Plaintiff was placed in administrative segregation. (SOF, ¶ 20; PSOF, ¶ 44) While in segregation, Plaintiff was taken off-site for an MRI on October 5, 2009. (SOF, ¶ 21) Impressions from the MRI were compatible with left paracentral herniation of the disc at C5-6. (Id.) The MRI noted the findings were "opposite the side of the patient's current symptoms." (Id.) Plaintiff remained in segregation until October 13, 2009, at which time he was transferred to PCC. (Id., ¶¶ 20, 22)

**B**. **Treatment received at PCC**

On November 12, 2009, Plaintiff complained he "hurt all over all the time." (SOF, ¶ 23) The following day, he had an appointment with the nurse. The nurse examined him and observed that he sat, stood and ambulated with no distress noted. (Id.)

On December 2, 2009, Plaintiff was examined by Dr. McKinney. (SOF, ¶ 24) Again, Plaintiff complained that he had been hit on the left side of his face with a basketball in April 2009 and heard an immediate "pop" and experienced severe neck pain. (Id.) He told Dr. McKinney that he had chronic "numbness" radiating in the right triceps, right ulnar area, and involving the right fifth finger and right thumb. (Id.) He also complained of persistent severe "piercing pain" in the right trapezius. (Id.) Plaintiff indicated he did not want a surgical procedure if it could be avoided. (Id.) Dr. McKinney reported that Plaintiff had decreased active range of motion in his right upper extremity versus his left upper extremity, and that his motor strength in his right upper extremity versus his left upper extremity was equal except for slight decreased strength in his right triceps. (SOF, ¶ 25) Dr. McKinney noted that in addition to the physical exam, he reviewed the MRI report and anatomical chart. (Id.) His treatment plan was to start Plaintiff on a prescription of Elavil, 25 mg. at night for 30 days, in hopes of decreasing pain, and improve muscle relaxation and function. (Id.) He recommended Plaintiff follow up with him in a month. (Id.)

On January 11, 2010, Plaintiff followed up with Dr. McKinney. Dr. McKinney observed that Plaintiff ambulated into the exam room at a normal rate, arms swinging at his side, with no apparent distress. (SOF, ¶ 28) Plaintiff rapidly moved his neck in all fields, gestured with both arms, flexed bilaterally knees and hips and was able to get on and off the exam table with no apparent significant discomfort. (Id.)[6] Plaintiff reported that his symptoms remained the same, except that the pain was more intense in his neck, with sharp pain radiating down the right upper

---

[6] Plaintiff contests these facts, stating that he exhibited "troubles ambulating." (PSOF, ¶ 58) However, as discussed above, conclusions, opinions and speculation are not sufficient to create an issue of fact.

extremity to the right thumb and fifth digit. (SOF, ¶ 26) He further complained of sharp pain radiating to his left upper extremity. (Id.) Plaintiff stated he spent all his time on his back watching TV because it was too painful to do anything else. (Id.) Plaintiff reported that the Elavil did not help at all, but then later stated he was able to sleep better and wanted to continue the prescription. (SOF, ¶ 26) During this appointment, Plaintiff also complained of popping and pain in his left hip and, at times, radiculopathy to the left foot. (SOF, ¶ 27) He explained that in October 1999, he fell three stories and landed on his hip, but that once he was put in jail, he refused evaluation. (Id.) Plaintiff stated that in May 2006, while exercising on an elliptical machine, he developed acute numbness in his left lower extremity. (Id.) Finally, Plaintiff reported that in May 2009, he worked 10-12 hours in the DOC factory and started developing left hip pain and complained of rotation and numbness on the plantar surface of his left foot. (Id.)

Upon light palpitation to the right of the C-7 area, Plaintiff hollered, jumped off the exam table and complained of a sharp electric shock extending all the way do his right upper extremity. (SOF, ¶ 28) Dr. McKinney's assessment was that Plaintiff had chronic neck pain with radiculopathy right upper extremity and new complaints of left upper extremity pain with abnormal C-MRI. (Id.) His treatment plan was to continue Plaintiff on the pain medication and extend his lay-in pending an orthopedic evaluation. (Id.) Dr. McKinney also recommended an x-ray of the left hip. (Id.)

On January 12, 2010, Dr. McKinney requested a referral for an orthopedic evaluation of Plaintiff's symptoms with Dr. John Spears, an orthopedic surgeon, which was approved the same day. (SOF, ¶ 29)

On January 13, 2010, Plaintiff was a no-show for his scheduled x-ray of his left hip, for

10

which he blamed custody.  (SOF, ¶¶ 30, 37)

The following day, January 14, 2010, Plaintiff self-declared an emergency complaining that he has "neck and spinal problems, and his arm was going numb." (SOF, ¶ 31) Dr. McKinney was advised of Plaintiff's complaints; however, no new orders were entered because he was already scheduled to see a specialist. (Id.)

Plaintiff returned to the infirmary on January 16, 2010, but would not provide the nurse with any information regarding the nature of his complaint. (SOF, ¶ 32) The nurse ended the interview due to Plaintiff's lack of cooperation. (Id.)

On January 18, 2010, Plaintiff was examined by Dr. Spears. (SOF, ¶ 33) After reviewing Plaintiff's MRI, Dr. Spears confirmed that Plaintiff had mild age-related degenerative changes to his cervical spine and that while there was some spondylosis and a small disc osteophyte complex at C5-6 on the left side, these degenerative changes could not be responsible for any of the complaints Plaintiff brought to his attention. (Id.) Dr. Spears advised that he showed Plaintiff his MRI, compared it to a model and went through the MRI frame by frame to explain to Plaintiff what was going on in his spine. (Id.)

On February 5, 2010, Dr. McKinney met with Plaintiff to discuss Dr. Spears' orthopedic evaluation. (SOF, ¶ 34) Plaintiff expressed his dissatisfaction with the evaluation. In particular, Plaintiff complained that Dr. Spears did not truthfully evaluate his muscle abilities, failed to review the entire MRI with him, did not fully evaluate his abilities to move his right upper extremity, and did not tell him what he thought might be wrong with him or make any suggestions. (Id.) In addition, Dr. Spears failed to inform him whether his condition was surgical or not. (Id.) Plaintiff stated he did not like Elavil and wanted to either change the prescription or

11

reduce it. Plaintiff was also interested in an EMG[7] and wanted a second MRI and a second opinion. (Id.)

According to Dr. McKinney, Plaintiff was alert and talkative during his appointment. (SOF, ¶ 35) He walked into the exam room without any difficulty and got on and off the exam table with ease. Dr. McKinney observed Plaintiff turning his head/neck rapidly and actively lifting either arm to level of his head without evidence of discomfort.[8] After Plaintiff voiced his complaints regarding the orthopedic evaluation, Dr. McKinney read him the impressions and recommendations. He advised Plaintiff that he would continue the prescription for Elavil, and that in his medical judgment, another opinion or MRI was not medically necessary or indicated. Dr. McKinney further advised Plaintiff that Dr. Spears had most likely been very thorough in both his evaluation and explanation of his findings and he was concerned Plaintiff was not hearing correctly the information presented to him. Dr. McKinney recommended a follow-up appointment in two months. (Id.)

From February 12, 2010 to February 14, 2010, Plaintiff refused his medication, Elavil, claiming it did not work. (SOF, ¶ 36)

On April 5, 2010, Plaintiff had a follow-up appointment with Dr. McKinney. (SOF, ¶ 37) Plaintiff complained of low back pain for approximately one year and pain in his left hip with movement. He further complained of "'popping in and out' of area lower L-spine and increased flatus." Plaintiff reported his neck was unchanged and volunteered that the Elavil was helpful

---

[7]An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction. Nerve conductions studies measure how well and how fast the nerves can send electrical signals. See www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies. (SOF, ¶ 34)

[8] See n. 6, supra. (PSOF, ¶ 75)

with both his neck and low back. Dr. McKinney noted that Plaintiff walked into the room, both hands in his pockets, with a fluid gait and no apparent distress. (SOF, ¶ 38) Dr. McKinney observed Plaintiff lift himself up with his arms and hop off the table without apparent discomfort.[9] Dr. McKinney's assessment was that Plaintiff's axial neck pain was stable and his left hip pain was suggestive of bursitis[10]. (Id.) Dr. McKinney's treatment plan was to reschedule the x-ray of the left hip and add the prescription drug Mobic. (Id.) Plaintiff requested a chair in his cell but Dr. McKinney informed Plaintiff that, in his medical judgment, a chair was not medically necessary. (Id.)

From April 15, 2010 through May 5, 2010, Plaintiff again refused his medication, Elavil, claiming it did not work and caused side effects. (SOF, ¶ 39)

Plaintiff underwent an x-ray of his left hip on May 26, 2010. (SOF, ¶ 40) The impression showed slight joint space narrowing, but was otherwise unremarkable. (Id.)

On June 18, 2010, Dr. McKinney saw Plaintiff for his complaints of pain in the lumbar-sacral area. (SOF, ¶ 41) Plaintiff stated that his pain decreased by sitting with his back "arched". Plaintiff further reported that he tried stretching and walking two laps around the track, however, his back pain was severe. (Id.) Dr. McKinney observed Plaintiff sit and rise from his chair quickly, ambulate without a limp, and get on/off the exam table quickly and without any complaints of pain.[11] (SOF, ¶ 42) Dr. McKinney advised that Plaintiff's history and exam remained most consistent with musculoskeletal etiology. (Id.) He further advised that Plaintiff's

---

[9] See n. 6, supra. (PSOF, ¶ 87)

[10] Bursitis is a painful condition that affects the small fluid-filled pads — called bursae — that act as cushions among the bones and tendons and muscles near the joints. Bursitis occurs when bursae become inflamed. See www.mayoclinic.com/health/bursitis/DS00032. (SOF, ¶ 38)

[11] See n. 6, supra. (PSOF, ¶ 115)

13

prescriptions would remain the same and he would follow-up with him in three months. (<u>Id</u>.)

On July 2, 2010, Dr. McKinney examined Plaintiff regarding his complaints of pain in his lumbar-sacral area. (SOF, ¶ 43) Plaintiff reported that on July 1, 2010, as he was leaving the dining hall, he pushed on the heavy exit door and felt severe "electric zap." (<u>Id</u>.) Plaintiff stated he was unsure where the pain was but he lost control of his bowels. (<u>Id</u>.) He further stated that on the date of the appointment, he had pain when he moved and touched the lower third of his T-spine. (<u>Id</u>.) He also complained that this pain was associated with bilateral numbness of his feet when sitting. (<u>Id</u>.) Prior to meeting with Dr. McKinney, Plaintiff was observed by the nurse rising quickly from a seated position in the waiting room. (SOF, ¶ 44) His gait was fluid and while obtaining vital signs he repeatedly was trying to look over his right shoulder without evidence of discomfort. (<u>Id</u>.) Dr. McKinney observed that Plaintiff rose from his chair quickly and had no problem getting on and off the examination table.[12] (<u>Id</u>.)

Dr. McKinney's assessment was persistent lower back pain, with the only change from the prior exam being the location of Plaintiff's pain. (<u>Id</u>.) Dr. McKinney reviewed the medical evaluation with Plaintiff and advised him that, in his medical judgment, there was no current indication for an MRI and nothing indicating the need for a surgical evaluation. (<u>Id</u>.) He advised Plaintiff to continue on his prescription medications and that he had a follow-up appointment scheduled, but if he needed to be seen sooner, he could fill out a Medical Services Request (MSR). (<u>Id</u>.)

On July 13, 2010, Plaintiff complained of numbness in his left leg, numbness down his right leg, and twitching in his right hand. (SOF, ¶ 45) Upon examination, Plaintiff's speech was

---

[12] <u>See</u> n. 6, <u>supra</u>. (PSOF, ¶ 127)

clear, he ambulated to medical erect and steady, no leaning or guarding noted, and he was able to stand easily from seated position. (Id.) His grip on his right hand was weaker than his left hand, but no decrease in range of motion to right arm or hand was noted. (Id.)

The next day, July 14, 2010, Plaintiff was observed leaving his cell to go to lunch.  His gait was steady and fluid. He walked down seven steps with his hand on the rail, and then continued walking down seven more steps with his hand on the rail. He walked out of his wing without difficulty, gait steady and fluid, and no limping noted. Plaintiff was also observed returning to his cell from lunch. At that time, his gait was steady and fluid, with no limping noted. Again, he walked up seven steps holding the railing, and then continued up the remaining seven steps with no difficulty. (SOF, ¶ 46)

On August 10, 2010, Plaintiff complained of pain in his back and hip and trouble walking. (SOF, ¶ 47) He requested crutches to walk. (Id.) Plaintiff was observed walking into the medical unit with a slight limp but no guarding or limited movement was noted. (Id.) Plaintiff was advised that he already had a scheduled doctor's appointment. (Id.) After the assessment, Nurse Kim Klein observed Plaintiff walk across the courtyard at a normal pace with a slight limp and moving his arms freely. He walked through the gate and turned and shut it without apparent difficulty. (SOF, ¶ 48)

On August 19, 2010, Plaintiff complained to Dr. McKinney that his back pain was worse. (SOF, ¶ 49) Based on Plaintiff's increased lower back pain, lack of response to his prescription medications, and the change from his prior examination on July 2, 2010, Dr. McKinney determined the need for additional evaluation with an MRI of lumbar spine (SOF, ¶ 50) On August 19, 2010, Dr. McKinney requested a referral for an MRI of Plaintiff's lumbar spine,

which was approved the next day. (Id.) On August 20, 2010, the MRI was performed at Vista

Imaging. (SOF, ¶ 51) The impressions were early disc degeneration at L4-5 with diffuse disc

protrusion and associated annular tear, otherwise negative MRI of the lumbar spine. (Id.) Based

on the abnormal MRI, Dr. McKinney requested a referral to Dr. Spears for a surgical evaluation,

which was approved on August 24, 2010. (SOF, ¶ 52) The next day, August 25, 2010, Dr.

McKinney met with Plaintiff to discuss the results of his MRI and the referral to an orthopedic

surgeon for further evaluation. (SOF, ¶ 53)

Dr. Spears examined Plaintiff the following week, on August 30, 2010. (SOF, ¶ 54) Dr.

Spears' impressions were the following:  (1) back pain; (2) degenerative disc, L4-5 mild, with a

small tear; and (3) no evidence of radiculopathy or myelopathy. (Id.) Dr. Spears reviewed the

MRI with Plaintiff frame by frame, and recommended sending Plaintiff for some lumbar epidural

steroid injections to see if that could improve some of his somatic axial back pain. (Id.)

According to Dr. Spears, anti-inflammatory medications, physical therapy, and avoidance of

aggravating activities was the hallmark of treatment for these problems of mechanical back pain

and degenerative disc disease.  (Id.)  He did not see any problem for which Plaintiff needed

surgery. (Id.)

On September 4, 2010, Plaintiff complained of back pain lasting for over one year. (SOF,

¶ 55) He was advised that his orthopedic surgeon stated his condition was not operable and that

he was to follow up with his doctor. (Id.) Plaintiff was further advised he had a follow up

appointment scheduled for September 10, 2010. (Id.)

On September 10, 2010, Plaintiff had an appointment with Dr. McKinney. (SOF, ¶ 56)

Plaintiff reported he was unhappy with Dr. Spears. He requested an evaluation by a specialist or

16

that Dr. McKinney treat his malaligned T-1 vertebrae, which was displaced in a motor vehicle accident about 14 years ago. (Id.) Dr. McKinney commented on the natural appearance of the T-1, and told Plaintiff he would follow up with him upon receipt of Dr. Spears' report and would not change his medication at this time. (Id.) Dr. McKinney further advised Plaintiff that per Dr. Spears' evaluation, Plaintiff did not have a surgical condition. (Id.)

Dr. McKinney met with Plaintiff to discuss Dr. Spears' evaluation on September 13, 2010. (SOF, ¶ 57) He recommended Plaintiff start physical therapy for his low back pain and hip.  If Plaintiff did not respond, then Dr. McKinney would consider epidural injections. (Id.) That day, Dr. McKinney requested a referral for a physical therapy evaluation and instruction on exercises. (SOF, ¶ 58) The referral was approved on September 15, 2010. (Id.) Also on September 15, 2010, Dr. McKinney ordered Plaintiff to be placed in the chronic pain/chronic care clinic. (SOF, ¶ 59)

On September 17, 2010, Plaintiff was examined by Nurse Kimberly Randolph in response to his complaints of pain in his hip, leg, knee and back, at which time he requested an increase in his prescription of Neurontin[13]. (SOF, ¶ 60) Nurse Randolph advised Plaintiff he was scheduled to begin physical therapy the following week and had a follow up appointment with the doctor on October 7, 2010, at which time his medication request would be addressed. (Id.) Nurse Randolph observed that Plaintiff ambulated with a limp but was able to stand steady and unassisted. (Id.)

---

[13] Neurontin (Gabapentin) is used to help control certain types of seizures in people who have epilepsy.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940.  Antiepileptic drugs like gabapentin are commonly used for treating neuropathic pain, usually defined as pain due to damage to nerves.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0014677. (SOF, ¶ 60)

On September 22, 2010, Plaintiff had a physical therapy evaluation. (SOF, ¶ 61) The physical therapist prescribed exercises to be performed at home for four to six weeks and then for Plaintiff to follow up with medical to report his progress. (Id.)

On October 7, 2010, Plaintiff was seen by Dr. McKinney regarding his complaints of back pain and the status of his home exercise program. (SOF, ¶ 62) During this appointment, Plaintiff advised he could do less than 50% of the physical therapy exercises. (Id.) Dr. McKinney encouraged Plaintiff to continue with physical therapy and suggested a trial of Prednisone to decrease inflammation. (Id.) If there was no improvement, Dr. McKinney advised that he would consider epidural injections to see if that could improve some of Plaintiff's somatic axial back pain. (Id.) He further recommended an x-ray of the T-spine, including the lower portion of the C-spine, for comparison to the 2009 x-ray. (Id.)

On October 15, 2010, Plaintiff had an x-ray of his T-spine performed at Mid-Missouri Medical. (SOF, ¶ 63) Dr. McKinney received a copy of the report the next week, on October 22, 2010. (Id.) The x-ray revealed mild rotoscoliosis[14] through the thoracic vertebral segments. (Id.)

On October 25, 2010, during his visit to the chronic care clinic, Plaintiff complained of left knee and hip popping and pain in his left foot and ankle. (SOF, ¶ 64) He stated that the chronic care visits were a joke, threatened IRRs and lawsuits and stated he needed a real doctor to tend to him. (Id.) The nurse's plan was to have Plaintiff continue with his physical therapy and follow-up with the doctor. (Id.)

Dr. McKinney examined Plaintiff on October 28, 2010. (SOF, ¶ 65) During this visit,

---

[14] Curvature of the vertebral column resulting from the column turning on its axis. See http://medical-dictionary.thefreedictionary.com/rotoscoliosis.  (SOF, ¶ 63)

Plaintiff reported his pain was localized to the L4-5 disc. He also reported pain in his knee and believed that his left knee was the source of his left hip pain. (Id.) Plaintiff advised he was unable to do more than 50% of the physical therapy home exercises, but had increased the number of repetitions and continues to gain muscle tone in his left lower extremity. (Id.) He blamed the exercises for causing him more knee pain and severe ankle pain. (Id.) Plaintiff claimed he had a "falling" arch on his left foot and requested arch supports. (Id.) After examining Plaintiff, Dr. McKinney found his condition was improving, with decreased pain and increased muscle tone.  (Id.) Dr. McKinney recommended Plaintiff continue his prescription medications and requested an x-ray of his left knee and left ankle. He also advised Plaintiff that in his medical judgment, arch supports were not medically necessary or indicated. (Id.)

On October 29, 2010, an x-ray of Plaintiff's left knee and left ankle indicated that both were normal. (SOF, ¶ 66)

On December 12, 2010, Plaintiff complained of sharp pain in his back and a "loose knee and hip." (SOF, ¶ 67) The nurse advised him that he had a doctor's appointment scheduled for December 20, 2010, and that if he was in so much pain he should self-declare an emergency and he would be brought to medical to be assessed and treated accordingly. (Id.)

During a follow up with Dr. McKinney on December 17, 2010, Plaintiff complained that his left hip was looser, and described his knee as "crunching" and increased "popping" in his left ankle. (SOF, ¶ 68) Dr. McKinney advised Plaintiff that the October 29th x-ray of his left knee and ankle were negative, and that in his medical judgment, he was unable to substantiate additional concerns regarding Plaintiff's left knee ankle or foot. (Id.) Dr. McKinney noted that Plaintiff's leg muscle tone and strength had improved and recommended that Plaintiff continue

with his current prescription and exercise as tolerated. (Id.)

On December 23, 2010, Plaintiff self-declared an emergency because his "back hurt so bad he can't walk, can't go to mainline." (SOF, ¶ 69) Plaintiff arrived at the infirmary in a wheelchair and advised the nurse that he knew there was nothing she would be able to do, but that he wanted to document that he was in pain. (Id.) That same day, Plaintiff was observed walking without difficulty. (SOF, ¶ 70)  On December 30, 2010, Plaintiff was observed leaving the medical unit walking without a limp or difficulty and at a fast rate. (SOF, ¶ 71)

On January 3, 2011, Plaintiff was transported to the infirmary in a wheelchair after he complained he could not make it back to his housing unit. (SOF, ¶ 72) Plaintiff reported that his left hip "locked up" and that he could not lift up his left lower extremity. (Id.) Dr. McKinney's assessment was chronic back pain. (Id.) Dr. McKinney placed Plaintiff in a 23-hour observation in the infirmary, continued current medications and added warm, moist pads for his back.  (Id.) The following morning, Plaintiff reported to Dr. McKinney that the warm, moist packs did not help because they put pressure on his spine, increasing his pain. (SOF, ¶ 73) Dr. McKinney found Plaintiff's back pain and abdominal pain improved from his prior examination on January 3, 2011, and discharged him back to his housing unit. (Id.) It was Dr. McKinney's medical judgment that Plaintiff's current lay-ins were appropriate. (Id.) He also recommended a mental health consultation for Plaintiff. (Id.)

On January 25, 2011, Dr. McKinney requested a referral for a neurological consult because Plaintiff did not consider the medical opinions of Dr. McKinney or Dr. Spears credible. (SOF, ¶ 74) The referral to Dr. Morris for a neurology consult was approved on January 26, 2011. (Id.)

Two days later, on January 28, 2011, Plaintiff had a follow up appointment with Dr. McKinney, during which he complained about hip pain and insisted on having an MRI and an evaluation by a hip specialist. (SOF, ¶ 76) Dr. McKinney advised Plaintiff that an appointment had been scheduled with a neurologist. (Id.) Plaintiff continued to insist on an MRI of his hip and an evaluation by a hip specialist. (Id.) Dr. McKinney examined Plaintiff and diagnosed his condition as chronic, diffuse musculoskeletal pain. (Id.) He explained to Plaintiff that in his medical judgment, he would continue the current prescriptions and the neurological evaluation and scheduled Plaintiff for a follow-up examination in six weeks. (Id.)

On February 16, 2011, Plaintiff complained of severe pain in his left groin. (SOF, ¶ 77) Plaintiff also complained about his medical care. (Id.) The nurse let him talk about his various problems for about 30 minutes, and Plaintiff voiced his appreciation for allowing him to vent. (Id.) Plaintiff was advised that he would be scheduled to see Dr. McKinney about his groin pain. (Id.)

 Dr. McKinney examined Plaintiff on February 18, 2011 regarding his abdominal pain. (SOF, ¶ 78) In order to rule an abdominal wall hernia, Dr. McKinney recommended a CT scan of Plaintiff's abdomen. (SOF, ¶ 78) He requested a referral for a CT on February 18, 2011, and the referral was approved on February 20, 2011. (SOF, ¶ 79) The findings of the CT scan conducted on February 22, 2011, were as follows: normal lung bases in the abdomen and pelvis; the liver spleen, pancreas and retroperitoneal space were within normal limits; there was no obstructive uropathy and the kidneys showed no masses. (SOF, ¶ 80) The deep pelvic structures showed a few diverticula but no obvious inflammation in the pelvis, and the bladder and the groin appeared within normal limits. (Id.)

21

On March 11, 2011, Plaintiff had an x-ray of his right knee, which showed mild medical joint space narrowing. (SOF, ¶ 81)

Plaintiff was evaluated by neurologist Dr. Morris, on March 18, 2011. (SOF, ¶ 82) Dr. Morris' examination revealed that Plaintiff had full strength (5 out of 5) in his upper extremities and right lower extremity. Plaintiff had some "give way secondary to pain diffusely in the left lower extremity" but strength was at least a 4 out of 5. His gait was antalgic type on the left due to pain in the hip and knee, with a limp. There was no foot drop and no ataxia. (SOF, ¶ 82) Dr. Morris' impressions were as follows: (1) cervical, thoracic and lumbar pains with report of degenerative disc and disc protrusion at L4-5 plus historical report of herniated nucleus polposus (HNP) cervical spine, could have some difficulty in the thoracic as well; (2) history of numbness, tingling in the lower extremities as well as right upper extremity, could be from multiple radiculopathies or stenosis in the cervical region or from peripheral neuropathy or other; and (3) bilateral hip and knee pains with history of DJD (osteoarthritis) involving the left hip, could be all related to that or some could be related to his spinal problems. (Id.) Dr. Morris recommended an EMG and nerve conduction studies (EMG/NCS)[15] of the upper and lower extremities, a formal orthopedic evaluation for osteoarthritis, and an MRI of the thoracic spine. (Id.) Dr. Morris also recommended increasing Plaintiff's prescription of Gabapentin and possibly adding a low dose of a tricyclic antidepressant if he continued having problems with pain control. (Id.)

Dr. McKinney met with Plaintiff on March 25, 2011, to review Dr. Morris' report. (SOF, ¶ 83) Plaintiff complained about Dr. Morris' "attitude" and that his exam was not the type of

_____

[15] See n.7, supra.

exam he expected and did not address his concerns. (Id.) Dr. McKinney advised Plaintiff that he

would be referred for the EMG and NCS of both upper and lower extremities and for an MRI of

the T-spine, but that in his medical judgment, and based on Plaintiff's previously discussed x-ray

reports and clinical evaluations of his left hip, knees and ankle, an orthopedic evaluation was not

medically necessary. (Id.) Dr. McKinney then requested a referral to Dr. Morris for an

EMG/NCS to rule out peripheral neuropathies, and a referral for an MRI of the T-spine; both

requests were approved the following day, March 26, 2011. (SOF, ¶¶ 84, 85)

Plaintiff underwent an MRI of the T-spine on March 31, 2011. (SOF, ¶ 86) The MRI

revealed diffused mild right convexity of the mid-thoracic spine. (Id.) The sagittal alignment was

normal. There was no compression deformity and no fracture lines were seen. There was also no

significant thoracic disc bulge, protrusion or extrusion identified.  (Id.)

Plaintiff was scheduled for the EMG and NCS on April 6, 2011. (SOF, ¶ 87) Plaintiff was

en route to the appointment when he requested that custody staff return him to PCC due to pain

from riding in the vehicle. (Id.; PSOF, ¶ 87)

On April 8, 2011, Plaintiff was admitted to T.C.U. because he complained that the discs

in his back were shifting and causing abdominal pain and he was unable to stand/walk to go to

the dining hall. (SOF, ¶ 88) Plaintiff was kept in the infirmary for observation until April 11,

2011. (Id.)

On April 21, 2011, Plaintiff was seen by a nurse for his complaints of extreme pain in his

mid-low spine. (SOF, ¶ 89) Plaintiff told the nurse he had been scheduled for testing and an MRI

but could not sit for over two hours and returned to the infirmary. The nurse told Plaintiff he

needed to have the tests and MRI completed and then he would meet with Dr. McKinney. (Id.)

She directed Plaintiff to continue his medications as ordered. (Id.)

Plaintiff complained of sharp pain in his mid lower spine on April 25, 2011, and was seen by a nurse on April 26, 2011. (SOF, ¶ 90) During this nursing visit, Plaintiff complained of athlete's foot, which was addressed by providing a foot cream. (Id.) He also complained of back and abdominal pain. (Id.) The nurse offered to schedule Plaintiff for a doctor's appointment to address his complaints. (Id.)

On May 11, 2011, Plaintiff was seen in response to a self-declared emergency. (SOF, ¶ 91) Plaintiff initially claimed he caught his hand in a door, but reported to Dr. McKinney that as he was returning from the shower, he slipped, started to fall and accidentally struck the door with his hand. (Id.) An x-ray revealed a fracture of the fifth metacarpal. (Id.) Dr. McKinney requested a referral for an orthopedic consult for Plaintiff's injury to his right hand, which was approved the next day, May 12, 2011. (SOF, ¶ 92)  On May 11, 2011, the orthopedic surgeon, Dr. Brown, examined Plaintiff and performed a closed reduction of his right fifth metacarpal. Dr. Brown recommended Plaintiff keep his hand elevated for 3 to 5 days. (SOF, ¶ 93) He further recommended pain medications, Norco and Naproxen, and a follow-up appointment within three to four weeks for an out of cast x-ray and re-evaluation. (Id.)

Upon return from the appointment with Dr. Brown, Nurse Spain contacted Dr. McKinney about the recommended prescriptions for Norco and Naproxn. (SOF, ¶ 94) Dr. McKinney ordered Tylenol w/codeine as needed for pain, for five days. (Id.) Plaintiff was then admitted to the infirmary. Dr. McKinney examined Plaintiff on May 12, 2011, at which time, Plaintiff requested to return to his housing unit, claiming the swelling in his right hand had decreased since his return and it really did not hurt that much. (Id.) Dr. McKinney requested a referral for

Plaintiff's follow-up exam with Dr. Brown in three weeks, which was approved the same day. (SOF, ¶ 95)

On May 25, 2011, Dr. Morris saw Plaintiff for EMG and NCS studies. (SOF, ¶ 96) The studies showed normal values on the lower extremities without evidence of radiculopathy, neuropathy or myopathy. (Id.) The EMG and nerve conduction studies could not be performed on the right upper extremities because of the cast on Plaintiff's hand and forearm. (Id.) Dr. Morris' impressions were as follows: (1) neck, T1-spine and lumbar spine and low back pains, with degenerative disc and disc protrusion at L4-5 plus reported HNP in the cervical region; (2) history of numbness and tingling in the lower extremities, right upper extremity, which could be from radiculopathy, but not noted on testing the lower extremities, could be some stenosis or peripheral neuropathy but no evidence of that on electrical studies at this time; and (3) bilateral hip and knee pains with history of osteoarthritis in the left hip. (Id.) Dr. Morris recommended increasing Plaintiff's prescription for Gabapentin.  (Id.) Dr. Morris further recommended the possibility of an orthopedic evaluation for possible osteoarthritis and epidural steroid injections. (Id.) Dr. Morris also recommended a tricyclic anti-depressant. (Id.)

Dr. McKinney received Dr. Morris' report on June 1, 2011, and instructed the medical staff to schedule Plaintiff for an appointment so he could discuss the results with him. (SOF, ¶ 97)

On June 8, 2011, Plaintiff returned to Dr. Brown for his follow-up appointment for his hand injury. (SOF, ¶ 98) According to Dr. Brown, Plaintiff was healing well but was not completely healed. Following his exam, Dr. Brown put Plaintiff back in the short arm cast. (Id.) Dr. McKinney requested a referral to Dr. Brown for further follow up. (SOF, ¶ 99) The referral

was approved on June 9, 2011, and Plaintiff was scheduled to return to Dr. Brown on or about June 29, 2011. (Id.)

On June 10, 2011, Dr. McKinney met with Plaintiff to discuss the results of his EMG/NCS report. (SOF, ¶ 100) Dr. McKinney advised Plaintiff that based on his complaints of pain, he would like an evaluation by mental health for possible somatization disorder.[16] (Id.) Dr. McKinney further explained to Plaintiff that he was not a psychiatrist, so he was not diagnosing somatization disorder, but that his goal was to help alleviate and care for Plaintiff's discomfort. (Id.) Plaintiff consented to the mental health consultation but also asked about a repeat MRI of the spine, MRI of the knees/hips and an orthopedic consultation. Dr. McKinney explained that per his prior evaluations, these procedures were not medically necessary. (Id.) He agreed to increase Plaintiff's dosage of Neurontin and scheduled him for a follow up appointment in a month to evaluate his condition with the increased dosage of Neurontin. (Id.)

Plaintiff filed a medical service request (MSR) on June 12, 2011 for his complaint of left knee pain. (SOF, ¶ 101) He was seen by Nurse Klein on June 13, 2011. She examined Plaintiff and found his left knee cool to touch, with no signs of fluid, discoloration or obvious deformity. Plaintiff showed no signs of distress. (Id.) Nurse Klein advised Plaintiff that he had a follow-up appointment with Dr. McKinney on July 11, 2011. (Id.)

Plaintiff had an initial psychiatric evaluation on June 14, 2011. (SOF, ¶ 102)

On June 29, 2011, Plaintiff had a follow-up appointment with Dr. Brown for his fractured fifth metacarpal. (SOF, ¶ 103) An x-ray of the right upper extremity/hand revealed good osseous

---

[16] Somatization disorder is a long-term (chronic) condition in which a person has physical symptoms that involve more than one part of the body, but no physical cause can be found.  People with this disorder have many physical complaints that last for years. Most often, the complaints involve chronic pain and problems with the digestive system, nervous system, and reproductive system. See www.nlm.nih.gov/medlineplus/ency/article/000955.htm. (SOF, ¶ 100)

alignment. (Id.)

In July 2011, Plaintiff was transferred to the Jefferson City Correctional Center ("JCCC"). (SOF, ¶ 104)

### C. Treatment received at JCCC

On July 5, 2011, Plaintiff had an initial evaluation with Dr. Swartz. (Id.) Plaintiff reported a history of back and lower-mid abdominal pain and injuries including: a three story fall in October 1999 where he landed on his left hip; acute numbness in his left lower extremity in 2006 while exercising; hit on the right side of the head with a basketball in April 2009; development of left hip pain with rotation and numbness in left foot while working in the factory; and motor vehicle accident 15 years ago. (Id.) Dr. Swartz scheduled Plaintiff for a complete physical and continued his medication as previously prescribed. (Id.)

On July 20, 2011, Plaintiff underwent a physical examination with Dr. Hardman. (SOF, ¶ 105) Dr. Hardman's assessment was as follows: cervical disc disease at C5-6; lumbar disc disease at L4-5 with disc protrusion and early annular tear; bursitis to left GRT trochanter; probably compensatory strain to left hip and left knee from lumbar spine pathology; and left scrotal varicocele. (Id.) Dr. Hardman treatment plan was to increase Plaintiff's prescription of Neurontin; refer him for a lumbar epidural steroid injection (ESI); continue physical therapy as tolerated; and smoking cessation. (Id.) Dr. Hardman further opined that an injection of the left knee and left trachanteric bursa, as well as  a cervical ESI and neurosurgical opinion, might be needed depending on Plaintiff's response to the lumbar ESI. (Id.) A referral for a CT guided Lumbar ESI for L4-5 was requested on July 20, 2011, and approved on July 21, 2011. (SOF, ¶ 106)

On July 20, 2011, Plaintiff refused the walker provided to him because he wanted a cane. (SOF, ¶ 107) He was advised that canes were not utilized at JCCC. (Id.) On July 21, 2011, Plaintiff refused an athletic supporter size large as too small, even though the large was the previously fitted and correct size. (Id.)

On August 1, 2011, Plaintiff underwent a CT guided ESI. (SOF, ¶ 108) The following day, August 2, 2011, Plaintiff met with Dr. Hardman to discuss the ESI procedure and reported immediate relief high in the lumbar area and some decreased pain in the left hip and knee. (SOF, ¶ 109) Dr. Hardman's treatment plan was to have Plaintiff return in one month for an assessment of the initial ESI. (Id.)

Plaintiff returned to the medical unit on September 8, 2011, for a continuity of care and assessment of ESI, at which time he reported the ESI did not help, even though his prior report was to the contrary. (SOF, ¶ 110) Plaintiff insisted on an "orthopedist" consult rather than further neurology to evaluate both hips, knees and low back. (Id.) Dr. Hardman's assessment was that Plaintiff was unchanged from the previous encounter. He recommended a referral for a second lumbar ESI; referral to general orthopedics for an opinion as to complaints of low back, hips and knees; smoking cessation; additional medication; and a left GRT trochanter injection and left knee injection. (Id.)

On September 9, 2011, Dr. Hardman requested a referral for a second ESI and a referral for a general orthopedic consultation as a second opinion, both of which were approved on September 12, 2011. (SOF, ¶¶ 111, 112)

On September 15, 2011, Dr. Hardman performed injections to Plaintiff's left GRT trochanter and left knee. (SOF, ¶ 113)

Following an orthopedic consult on September 21, 2011, an MRI of the spine without contrast was recommended. (SOF, ¶ 114)

Plaintiff underwent the second lumbar ESI on September 23, 2011, but did not experience significant relief immediately following the injection. (SOF, ¶ 115)

On September 28, 2011, after receiving the orthopedic evaluation, Dr. Hardman requested a referral to schedule an MRI of Plaintiff's cervical, thoracic and lumbar spine in preparation for a follow-up examination by orthopedist Dr. Norregard at the University of Missouri. (SOF, ¶ 116) Dr. Hardman also requested a referral for follow-up appointment with Dr. Norregard after the MRIs were completed. (Id.) Both referrals were approved on September 28, 2011. (Id.)

On October 13, 2011, Plaintiff was seen by Dr. Hardman for a continuity of care assessment. (SOF, ¶ 117) Plaintiff was observed as aggressive, ranting and raving about his various illness perceptions. (Id.) Dr. Hardman noted that Plaintiff was scheduled for MRIs of the spine and an appointment with Dr. Norregard so he would wait for specialist guidance. (Id.) Dr. Hardman further noted he would not schedule Plaintiff for a third ESI at Plaintiff's request. (Id.)

Plaintiff underwent the MRI of his cervical, thoracic and lumbar spine on October 14, 2011. (SOF, ¶ 118) The impressions from the MRI showed minimal disc bulge at L4-5 with an annular tear centrally; no spinal canal, lateral recess or neural foramina stenosis present at any level in the lumbar spine. (Id.)

On October 28, 2011, Plaintiff had his follow-up appointment with the specialist following his MRI. (SOF, ¶ 119) Plaintiff had neck, thoracic and lumbar pain with no clear radiculopathy, no atrophy and no clear cut weakness, and mild disc degeneration at L4-5 and C6.

29

(<u>Id</u>.) He was directed to continue muscle exercises. (<u>Id</u>.)

On November 10, 2011, Plaintiff returned to the medical unit for his continuity of care visit with Dr. Hardman.(SOF, ¶ 120) Plaintiff reported that the GRT trochanter injection at first had no result, but was now doing well. (<u>Id</u>.) He further advised his left knee was pain free and requested the injection for the right knee. Plaintiff reported he had no improvement with the first ESI, 50% improvement with the second ESI and was now requesting the third ESI. (<u>Id</u>.) Dr. Hardman's treatment plan was to refer Plaintiff for the third ESI, schedule him for an injection for the right knee, continue his medications, add an additional medication and follow-up with him in the pain clinic rotation in 6 months. (<u>Id</u>.) Plaintiff was advised to file an MSR if he needed interim treatment. (<u>Id</u>.)

On November 14, 2011, Dr. Hardman requested a referral for the thrid ESI to the lumbar spine, which was approved on November 15, 2011. (SOF, ¶ 121) On November 22, 2011, Plaintiff was transferred from JCCC to Northeast Correctional Center ("NECC"). (SOF, ¶ 122)

**D. Treatment Received at NECC**

On November 28, 2011, Plaintiff submitted an MSR requesting to see a doctor. (<u>Id</u>.) Plaintiff was seen by a nurse on November 28, 2011, at which time, he complained that "my vertebrae are shifting in mid back." The nurse referred Plaintiff to the doctor. (<u>Id</u>.)

On November 29, 2011, Plaintiff had an injection in his right knee and reported immediate relief. (SOF, ¶ 124) He underwent the third ESI to the lumbar spine on December 1, 2011, and reported partial immediate relief with the injection. (SOF, ¶ 125)

Plaintiff was seen by Dr. Archer on December 7, 2011, in response to his complaints of back pain. (SOF, ¶ 126) Plaintiff reported that he was currently in litigation with his previous

camp because they did not do anything for his back pain and "any doctor who doesn't do anything will be named in the lawsuit." Dr. Archer's treatment plan was to continue epidural injections for analgesic management. (Id.)

On January 10, 2012, Plaintiff was transferred from NECC to ERDCC. (SOF, ¶ 127)

**E. Treatment Received at ERDCC**

Plaintiff self declared an emergency on January 30, 2012, for back pain. (SOF, ¶ 128) He claimed he had "a major lawsuit" against CMS/Corizon, that "his people are contacting Jeff City as we speak to find out what is going on with my back, and why I haven't been treated," and that he was "suing each doctor that has not done what was ordered by the outside specialist." (Id.) Plaintiff was scheduled to see Dr. Mullen on February 2, 2012, for his chronic back pain. (Id.) Plaintiff was examined by Dr. Mullen on February 7, 2012. (SOF, ¶ 129) Dr. Mullen's treatment plan was to continue Plaintiff on his prescribed medications and physical therapy. (Id.)

On March 6, 2012, Dr. Mullen had a follow-up appointment with Plaintiff. (SOF, ¶ 130) Following the appointment, Dr. Mullen requested an MRI of the hip, which was denied because medical need was not established. (Id.) A referral request for an x-ray of the hip was approved on March 9, 2012.  (Id.)

On March 19, 2012, Plaintiff had injections to his right knee and left hip and an x-ray of his left hip. (SOF, ¶ 131) The x-ray of the left hip was normal. (Id.)

On March 26, 2012, Plaintiff self-declared an emergency because he could not put any weight on his legs.  (SOF, ¶ 132) He was seen by Dr. Mullen on March 27, 2012. Dr. Mullen's objective findings were degenerative osteoarthritis of knees and hips. (Id.) Dr. Mullen's treatment plan was to have Plaintiff return in two weeks to recheck his right knee and have him continue to

use the wheelchair for two weeks. (Id.)

At his follow up on April 6, 2012, Plaintiff reported continued pain in his right knee and low back. (SOF, ¶ 133) The objective findings were that his right knee was stable, he had normal range of motion, his best ambulation was with a cane, and he had normal ability to rise from the chair, kneel and crouch but did need support. He also had good muscle tone. (Id.) The plan was for Plaintiff to work on an exercise program with stretching for upper and lower back. (Id.)

On April 21, 2012, Plaintiff had a self-declared emergency for his back pain. (SOF, ¶ 134) Plaintiff was seen by the nurse, who was unable to see any protrusion on his back. (Id.) When the nurse so informed Plaintiff, he accused her of not knowing how to do her job and threatened to call his lawyer. (Id.)

On May 31, 2012, Plaintiff was seen by a nurse in medical complaining that "my back hurts," "my knee hurts," "my throat hurts" and that there is a "history of throat cancer in my family." (SOF, ¶ 135) Plaintiff was referred to Dr. Mullen for further evaluation. (Id.)

**IV. <u>Discussion</u>**

Deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. <u>Prosser v. Nagaldinne</u>, 2013 WL 210904, at *17 (E.D. Mo. Jan. 18, 2013) (citing <u>Nelson v. Corr. Med. Servs.</u>, 583 F.3d 522, 531–32 (8th Cir.2009) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)). To establish deliberate indifference, Plaintiff "must prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it." <u>Id</u>. The second part of the test requires Plaintiff to prove that the prison officials were more than negligent. <u>Id</u>. (citing <u>Alberson v. Norris</u>, 458 F.3d 762, 765 (8th Cir. 2006)). Plaintiff must show that the prison official's mental state was

"akin to criminal recklessness." Id. (quoting Gordon ex. rel. Gordon v. Frank, 454 F.3d 858, 862 (8th Cir.2006)).

Plaintiff alleges Defendants were deliberately indifferent to his serious medical needs by ignoring medical complaints or symptoms, causing unnecessary delays in care, denying referrals to medical specialists, denying diagnostic testing, and ignoring his requested course of treatment. (FAC, ¶¶ 1-12) Specifically, Plaintiff alleges Drs. Hakala and McKinney (1) failed to properly treat his degenerative disc deterioration in his cervical and lumbar spine; (2) failed to respond reasonably to the pain and suffering related to his spine after having knowledge of his bulging disc, herniated disc, and degenerative disc deterioration; (3) failed to treat his vertebrae and disc deficiencies; (4) failed to correct the tenderness and scoliotic deformity localized in his cervical and thoracic spinal areas; and (5) delayed examination of his hip and knee joints for over 1 ½ years. (FAC, ¶¶ 3, 4, 5, 8 and 9) Plaintiff further alleges Drs. Hakala and McKinney knew that the prescribed pain medication failed to relieve his symptoms and caused serious side effects. (FAC, ¶ 7) Finally, Plaintiff alleges Dr. Hakala failed to provide Plaintiff with proper treatment for his chronic pain from a previous work-related injury and disc deterioration in the thoracic and lumbar spine. (FAC, ¶¶ 1-2) With respect to the nursing staff, Plaintiff alleges that nurses Vinson, Randolph, Spain and Klein failed to address his complaints and provide proper care and treatment. (FAC, ¶¶ 3, 5, 10-12)

Contrary to Plaintiff's claims, the record reflects repeated attention to his medical condition and the exercise of independent medical judgment as to the proper course of treatment. Plaintiff was seen regularly by Defendants and his complaints were consistently noted and acted upon. (SOF, ¶¶ 10-135) Indeed, during his confinement at SECC, Plaintiff was examined by

33

medical personnel regarding his subjective complaints on nine occasions. (SOF, ¶¶ 10-21) Once transferred to PCC, Plaintiff was examined by medical personnel on fifty-four occasions. (SOF ¶¶ 22-103) "Although multiple contacts with medical personnel do not always preclude a finding of deliberate indifference," see Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir. 2000), in this case, Plaintiff's contacts with medical personnel and specialists establish the lack of any prima facie case of deliberate indifference to his back pain and degenerative disc disease.

During the time period at issue, referrals were requested and approved for Plaintiff to undergo diagnostic testing, including numerous x-rays, MRIs, a CT scan and EMG/NCS studies, and to consult specialists, including an orthopedic surgeon and a neurologic specialist. Plaintiff was prescribed multiple medications for pain, epidural steroid injections, and physical therapy. Based on the results of the various diagnostic tests and recommendations of orthopedic and neurologic specialists, there was no objective finding of any medical conditions that required surgical intervention. Both Drs. Hakala and McKinney diagnosed Plaintiff with age-related degenerative changes to his cervical spine, presenting as chronic low back pain. Orthopedic specialist Dr. Spears confirmed this diagnosis and opined that these degenerative changes could not be responsible for any of the complaints Plaintiff brought to his attention. According to Dr. Spears, anti-inflammatory medications, physical therapy, and avoidance of aggravating activities are the "hallmark" of treatment for mechanical back pain and degenerative disc disease.

The Court finds this to be a reasonable treatment decision and, even if later found to be wrong, cannot be considered deliberate indifference. Inmates do not have a constitutional right to any particular type of treatment. Johnson v. Singer, 2008 WL 3982066, at *5 (E.D. Mo. Aug. 25, 2008) (citing Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996)). Moreover, a mere disagreement

with the course of treatment or a physician's medical diagnosis fails to state an Eighth

Amendment claim of deliberate indifference to serious medical needs. See Peterson v.

Correctional Medical Services, 2012 WL 4108908, at *13 (E.D. Mo. Sept. 18, 2012) (citing

Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997) ("the Court is reminded that 'society

does not expect that prisoners will have unqualified access to health care,' and that '[a]s long as

th[e] threshold [of deliberate indifference] is not crossed ... prison doctors remain free to exercise

their independent medical judgment.'"); see also Vaughn v. Gray, 557 F.3d 904, 909 (8th

Cir.2009) (an inmate's Eighth Amendment rights are not violated by defendants' refusal "to

implement a prisoner's requested course of treatment") (internal citation omitted). And, likewise,

prison physicians do not have to follow the recommendation of an outside consultant; they are

free to exercise their independent medical judgment in determining the course of treatment to be

followed. See Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1118–19 (8th Cir.2007).[17]

While Plaintiff may dispute the timeliness and sufficiency of the medical care he received

from Dr. Hakala, Plaintiff acknowledges he was, in fact, examined and treated. And significantly,

the record contains no medical evidence verifying that Plaintiff suffered any long term

detrimental effect from an alleged delay in treatment. See Laughlin v. Schriro, 430 F.3d 927, 929

(8th Cir. 2005) (when inmate bases Eighth Amendment claim on treatment delays, he must offer

verifying medical evidence establishing detrimental effect of delays); Johnson v. Adams, 452

---

[17] Defendants have provided the Court with medical records which verify each statement made to support their motion for summary judgment. Under such circumstances, an inmate cannot create a question of fact by merely stating that he did not feel he received adequate treatment. Dulany, 132 F.3d at 1240. Proof of causation by expert testimony is required when a plaintiff is complaining about treatment of a sophisticated injury. See Alberson v. Norris, 458 F.3d 762, 765-66 (8th Cir. 2007). In this case, however, even if Plaintiff had presented expert testimony, it would not have refuted the objective medical records evidencing his continued care and treatment sufficient to give rise to an inference of deliberate indifference by Defendants.

Fed.Appx. 708 (8th Cir. 2012) (no trialworthy issues on claims against physician where record contained no medical evidence showing plaintiff had suffered long-term adverse effect from the treatment delay). Moreover, Plaintiff admits he had x-rays (Aff., ¶ 43) and a cervical MRI. (Id., ¶ 69) His medical records also show he was prescribed Naproxen for neck or leg pains. (Doc. No. 175-1, pp. 154-55) "Federal courts are reluctant to second guess treatment decisions made by competent physicians. Disagreement with a medical judgment is not sufficient to state a claim for deliberate indifference to medical needs." Blair v. Brown, 2011 WL 6715888, at *4 (E.D. Mo. Dec. 21, 2011) (quoting Reynolds v. Crawford, 2007 WL 1656269, at *3 (E.D. Mo. June 6, 2007)(internal quotations and citations omitted)). See also Bell v. Hakala, 2011 WL 2671826 at *5 (E.D.Mo. Jul. 8, 2011) ("Medical care so inappropriate as to evince intentional maltreatment or a refusal to provide essential care violates the Eighth Amendment, but a mere disagreement with the course of medical treatment does not constitute a claim of deliberate indifference.") (citations omitted).

The record further demonstrates that Dr. McKinney treated Plaintiff in a responsive and timely manner, whether it was a referral to a specialist, prescription medication, lay-in requests, diagnostic testing and imaging, or procedures. Indeed, the evidence before the Court is that Dr. McKinney requested the following referrals for Plaintiff, all of which were approved: (1) Dr. Spears for orthopedic evaluations on two separate occasions (SOF, ¶¶ 29, 52); (2) physical therapy (SOF, ¶ 58); (3) x-rays of his T-spine, left knee, left ankle, left hip, right knee (SOF, ¶¶ 62, 65, 81); (4) a neurological consult with Dr. Morris (SOF, ¶¶ 74, 82); (5) a psychiatric consult for mental health reasons (SOF, ¶¶ 100, 102); (6) a CT of the abdomen (SOF, ¶ 79); (7) MRIs of the thoracic and lumbar spine (SOF, ¶¶ 50, 51, 86); and (8) an orthopedic consult with Dr. Brown

(SOF, ¶¶ 91, 99). In fact, Plaintiff admits he was examined by Dr. McKinney "at least" twelve times, and that he issued medical lay-ins to Plaintiff for a cane, a bottom walk cell, and assistance with his food trays. (Mem. in Supp., Doc. No. 203, p. 9; PSOF, ¶¶ 90, 102, 149) Although Plaintiff complained that the pain medication Dr. McKinney prescribed to him-Elavil-was not helping alleviate his symptoms, he later reported to Dr. McKinney that he was able to sleep better and wanted to continue the prescription. (SOF, ¶ 26) In fact, at an April 2010 follow up appointment, Plaintiff volunteered that the Elavil was helpful with his neck and low back pain (SOF, ¶ 37) Later, when Plaintiff complained of the need for additional pain management, Dr. McKinney addressed Plaintiff's complaints of pain by prescribing Neurontin/Gabapentin. (PSOF, ¶ 149)

It is true that Dr. McKinney denied some of Plaintiff's requests for referrals for additional MRIs, orthopedic evaluation, and arch supports based on his medical judgment that they were not medically necessary or indicated (see SOF, ¶¶ 65, 83, 100); however, mere disagreement with treatment decisions fails to state a claim of deliberate indifference, see Peterson, 2012 WL 4108908, at *13, and prison doctors are free to exercise their independent medical judgment. Meuir, 487 F.3d at 1118–19.

Likewise, the undisputed material evidence and medical records establish that the nursing staff did not fail to address Plaintiff's complaints and, in fact, did provide him with proper care. Plaintiff was seen multiple times by nurses who listened to him and made detailed entries into his medical file regarding his symptoms and complaints. The nurses appear to have conscientiously evaluated each problem and in many cases referred Plaintiff to a doctor to review his condition. (See e.g., SOF, ¶¶ 12, 16, 47, 77) See also Camberos v. Branstad, 73 F.3d 174, 177 (8th Cir.

1995) (prison nurses not deliberately indifferent to inmate's medical need for a referral to a shoulder specialist because nurses lacked authority to refer inmate to an outside physician, but took other available steps to ensure inmate was receiving appropriate treatment). Most important, there is no evidence that the nurse defendants were personally involved in any of the treatment decisions at issue. See Petersen v. Kaemingk, 2013 WL 4731051, at *1 (8th Cir. Sept. 4, 2013) (no deliberate indifference to inmate's serious medical needs where there was no evidence that the prison official and nurse defendants were personally involved in treatment decisions).

As the Director of Nursing for SECC, Nurse Vinson's responsibilities included facilitating medical complaints, scheduling doctor appointments, maintaining medical files of offenders for outside referrals, and supervising nursing staff. (FAC, ¶ 3) She never treated Plaintiff directly. (SOF, ¶¶ 10-21) Because Plaintiff has not submitted evidentiary materials indicating how Nurse Vinson was deliberately indifferent with respect to his medical care, he cannot show she engaged in a constitutional violation.

Nurse Spain was the Director of Nursing at PCC. (FAC, ¶ 5) Plaintiff alleges she failed to address his complaints of chronic pain and failed to provide unbiased administrative assistance to expedite treatment of his complaints. (FAC, ¶¶ 11-12) Plaintiff's claims are refuted by the record. Nurse Spain responded to Plaintiff's Informal Resolution Request, 09-1268, filed on December 21, 2009, and received by the medical staff on December 22, 2009. (SOF, ¶¶ 136-141) She attempted to speak with Plaintiff regarding his concerns, but he was unwilling to participate in the IRR process. As a result, Nurse Spain based her review on Plaintiff's medical records, and concluded that his complaints for non-treatment were unsupported. (Id., ¶ 138) Plaintiff then filed a grievance and an appeal, all of which were found to be unsupported. (Id., ¶¶ 136-141) The

Regional Director found "no lack of healthcare by the medical staff who are licensed, qualified healthcare professionals with many years of experience." (Id., ¶ 141)

Nurse Randolph was the Health Services Administrator at PCC and responsible for the overall administrative and professional operations of the PCC Medical Unit, including coordinating medical programs, and assisting in the investigations of grievances filed by offenders. (FAC, ¶ 6) Plaintiff alleges Nurse Randolph failed to treat his vertebrae and disc deficiencies (FAC, ¶ 5) and failed to provide unbiased administrative assistance to expedite treatment of his complaints. (FAC, ¶¶ 11-12) Again, Plaintiff's claims are refuted by his own medical records demonstrating Nurse Randolph's involvement with his care at PCC.

As a licensed practical nurse at PCC, Nurse Klein's responsibilities included processing Medical Service Requests, entering offenders' complaints and preliminary vitals into their medical files, scheduling doctor appointments, and distributing medications. (FAC, ¶ 7) Plaintiff alleges Nurse Klein refused to allow an x-ray technician to perform the examination ordered by his doctors. (FAC, ¶ 10) Plaintiff's claim is refuted by the record. On January 13, 2010, Plaintiff did not show for his scheduled x-ray of his left hip. (SOF, ¶¶ 30) On January 16, 2010, Plaintiff asked to reschedule since the corrections officer would not release him for his medical appointment and, at Plaintiff's request, the x-ray was rescheduled to April 6, 2010. (SOF, ¶ 37-38, 40; PSOF Ex. 88)

Finally, the record demonstrates that even after he was transferred from PCC in July 2011, Plaintiff continued to receive care and treatment for his chronic pain. (See SOF ¶¶ 104-135) He had x-rays of his hip and MRIs of his cervical and lumbar spine. He was administered epidural steroid injections and cortisone injections to his knees and hip. Medical staff continued to refer

Plaintiff for physical therapy and various prescription medications for pain. The objective findings of the treating doctors were neck, thoracic and lumbar pain with no radiculopathy, atrophy or clear cut weakness, and mild disc degeneration at L4-5 and C6. (SOF, ¶¶ 104-135)

**V**. **Conclusion**

Plaintiff presents a detailed medical history giving rise to his claims. He has failed, however, to present sufficient evidence to "'clear [the] substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded [his] needs by administering an inadequate treatment.'" Peterson, 2010 WL 4108908, at 16 (E.D. Mo. Sept. 19, 2012) (quoting McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009)). The care Plaintiff received for his complaints of chronic pain in his back, neck, hip and left knee was consistent with the care and treatment provided to someone with chronic pain, mechanical back pain and degenerative disc disease. For these reasons, the motion for summary judgment will be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [173] is **GRANTED**.

An appropriate Judgment will accompany this Memorandum and Order.


Dated this 25th  day of September, 2013.


_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE